UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JOHN G. RYAN, INC.,

                    **MEMORANDUM AND ORDER**

          Plaintiff,                **05-CV-3984 (NGG)(JMA)**

     v.

MOLSON USA, LLC,

             Defendant.
------------------------------------------------------X
GARAUFIS, United States District Judge.


       Plaintiff, John G. Ryan, Inc. ("Ryan"), a New York beer distributor, is a party to a written

distribution agreement with the Defendant, Molson USA LLC ("Molson USA" or "Molson"), a

beer wholesaler.  In July 2005, Molson USA commenced an arbitration against Ryan pursuant to

a broad arbitration clause contained in their written distribution agreement, seeking a declaration

that Molson USA has the legal right to terminate its relationship with Ryan.  Ryan responded by

instituting an action in Supreme Court of the State of New York, Suffolk County, seeking a

dismissal or permanent stay of the arbitration.  On August 18, 2005, Ryan took further action by

filing an ex parte Order to Show Cause in New York state court, which included a temporary

stay of the arbitration until the return date of the application, September 8, 2005.  On August 19,

2005, Molson USA removed the case to federal court.  The parties appeared before me on

September 15, 2005, at which time a briefing schedule was set for the pending motions to stay

arbitration and to dismiss the case.  The parties agreed at the September 15, 2005 hearing to

voluntarily stay arbitration until the date of oral argument.  On October 19, 2005, I heard oral

argument on the issues and reserved decision until now.  The parties have also agreed to

voluntarily stay arbitration pending my decision in the matter.

At this time, I consider Molson's Motions for Summary Judgment and to Compel Arbitration. Although presented jointly as Motions for Summary Judgment and to Compel Arbitration, Molson moves, in effect, to compel arbitration, whereas Ryan seeks a permanent stay of arbitration. There are no material issues of fact in dispute.

The issue before the court is a complex legal issue, and one of first impression in this Circuit, concerning the interplay between a provision of the New York Alcoholic Beverages Control ("ABC") Law, the Federal Arbitration Act ("FAA"), the Twenty-first Amendment to the United States Constitution, and the Supremacy Clause. The question presented is whether the New York ABC Law provision, which directly conflicts with the mandate of the FAA, is preempted by that federal act under the Supremacy Clause, or whether it is somehow "saved" by the Twenty-first Amendment. For the reasons set forth below, the court finds that the Federal Arbitration Act preempts the New York ABC Law provision. Accordingly, Molson's motions for summary judgment and to compel arbitration are GRANTED.

## I.      Background

### A.      The Relationship Between Ryan and Molson USA

Molson USA is a Delaware company owned by Molson Coors Brewing Company. (Declaration of Geoffrey E. Molson ("Molson Decl.") ¶ 2). Molson USA was formed to serve as a joint venture between Coors and Molson Coors Brewing Company for the importation and distribution of Molson products in the United States. Molson USA began operations in early 2001. (Molson Decl. ¶ 4).

Before Molson USA began operating, Molson products were imported and distributed by

a joint venture between affiliates of Molson, Inc. and Miller Brewing Co. (Id. ¶ 5). When Molson, Inc. ceased using Miller to import and distribute its products, it promised Miller that existing Molson distributors would be given the opportunity to continue distributing Molson products. (Id.) Plaintiff Ryan was one such existing Molson distributor. To effectuate the promise, Molson USA created a document known as the "Molson Amendment." This was a four-page base document that supplemented the distributor's prior agreement, if any such prior agreement existed. (Id.) Molson USA intended to use the Molson Amendment with distributors who had no prior *written* agreement with the Molson/Miller joint venture. Again, Ryan was such a distributor. Where there was no existing prior written agreement, as was the case with Ryan, the Molson Amendment incorporated as an exhibit a blank distributorship agreement (i.e. the form which had been used by the Miller/Molson venture). (Id.) Existing distributors were not required to sign the Molson Amendment, but were encouraged by Molson USA and Coors to do so. (Id.)

The Molson Amendment between Ryan and Molson USA was the first written agreement between the parties. (Id. ¶ 6). Initially, Ryan signed the amendment "under protest" and attached to it a letter to Coors explaining its belief that the agreement "as written, is not fair and equitable to the distributor." (Ryan Petition; Affidavit of J. Gerald Ryan ("Ryan Aff.") ¶ 7; Ryan Aff. Ex. C). Molson USA refused to accept the amendment with protest, and informed Ryan as much in writing, stating "should you reconsider signing the Amendment as originally submitted to you, please do not include any form of amendment, waiver, disclaimer, addendum, etc. and do not cross-out or add any language to the Amendment." (Ryan Aff. ¶ 8; Ryan Aff. Ex. D). Ryan then signed the Amendment in its original form and returned it to Coors without any

noted protest. Gerald Ryan, president of John G. Ryan, Inc., contends that he signed the

Amendment because it was his "firm belief that Ryan would be terminated by Coors if it did not

sign the Molson Amendment as requested." (Ryan Aff. ¶ 9). He prepared an internal

memorandum dated March 1, 2001– that was <u>not</u> forwarded to Coors or Molson USA –

indicating that Ryan signed the Amendment under continued protest. (<u>Id.</u>; Ryan Aff. Ex. E).

The Molson Amendment contains a broad arbitration provision, stating:

> [a]ny and all disputes between Distributor and the Company or its
> agent, Coors, except nonpayment of Distributor's account,
> including without limitation a dispute as to whether the Company
> has grounds to terminate this Agreement, which disputes are not
> resolved by Mediation, shall be admitted to binding arbitration in
> the city nearest to the Distributor in which there is a regional office
> of the American Abitration Association, before a single arbitrator,
> in accordance with the Commercial Arbitration Rules and
> procedures of the American Arbitration Association.

(Ryan Aff. Ex. B).

The facts are not clear as to when the Molson Amendment was signed by Molson USA.

Molson USA admits that it does not know if it was signed in 2001 or 2002, and that a search of

the company's records does not indicate one way or another. (Molson Decl. ¶ 7). On October,

28, 2002, however, it is undisputed that Molson USA sent a letter to Ryan offering Ryan the

opportunity to sign an entirely new Molson distributorship agreement. (<u>Id.</u>; Ryan Aff. Ex. F). In

that letter, Molson acknowledged receipt of Ryan's signed Molson Amendment, and Molson

acknowledged that its offer of a "new Agreement does not reflect a change to previous

communications regarding consolidation for your market."[1] (Ryan Aff. ¶ 11; Ryan Add. Ex. F)

---

[1] In early 2005, in preparing for the arbitration, Molson discovered that it did not have in
its files a copy of the Molson Amendment signed by both Ryan and Molson USA, but rather
only the copy signed by Ryan. The parties, however, had effectively operated under the Molson

At about the time of the Coors-Molson Joint Venture in 2002, Molson USA announced that it was consolidating distributors in the New York market into Coors distributors. (Molson Decl. ¶ 9; Ryan Aff. ¶ 10). Molson encouraged non-Coors Molson distributors to consider selling their Molson distribution rights to Coors distributors in their particular territory as part of its nationwide consolidation plan meant to increase profits for both Molson and Coors. Throughout 2003, Ryan, through its counsel, corresponded with Molson USA and Coors Brewing Co. disputing Molson's right and efforts to consolidate the New York market. (Ryan Aff. ¶ 12; Ryan Aff. Ex. G). Throughout, Ryan declined to sell its rights. (Molson Decl. ¶ 9). On February 9, 2005, Molson and Coors merged.

On March 11, 2005, Molson USA sent Ryan a letter again encouraging Ryan to sell its distribution rights in support of Molson's nationwide policy of consolidation. (Ryan Aff. ¶ 13; Ryan Aff. Ex. H). Ryan did not respond to the March 11, 2005 letter. (Ryan Aff. ¶ 14). Ryan has not, as of this date, been terminated as a Molson distributor. (Id. ¶ 15). On July 22, 2005, Molson USA commenced an arbitration proceeding before the American Arbitration Association ("AAA") seeking a determination that Molson USA has a right to terminate Ryan as a Molson distributor, with appropriate compensation, pursuant to section 55-c of the New York Alcoholic Beverages Law. (Molson Decl. ¶ 10; Ryan Aff. ¶ 17). The instant action followed.

---

Amendment since it was first signed by Ryan and returned to Molson in 2001. (Molson Decl. ¶ 7). Molson USA signed the Molson Amendment on June 27, 2005, and a copy of the signature page was attached to the demand for arbitration. (Id. ¶ 8). When the parties appeared in state court on the Order to Show Cause, Ryan had not received a copy of the full Molson Amendment signed by both parties. (Molson Decl. ¶ 8; Ryan Aff. ¶17). Molson USA has since sent a copy to Ryan. (Molson Decl. ¶ 8).

**B.     Section 55-c of the New York ABC Law**

The New York statutory provision at issue in this case is Section 55-c(7)(c) of the New York Alcoholic Beverages Control Law (hereinafter "Section 55-c"), entitled "Agreements between brewers and beer wholesalers."  The purpose of the statute is explained as follows:

> It is hereby declared to be the policy of this state, that the sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a written agreement. That further, the regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of this state and in the public interest.

N.Y. ABC Law § 55-c(1).  Pursuant to the powers reserved to the States by the Twenty-first Amendment, New York, like many other states, has statutorily mandated a three-tier system for the distribution of beer.  See generally, N.Y. ABC Law; see also Granholm v. Heald, 125 S.Ct. 1885, 1892 (2005) ("We have previously held that States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment.").  At the top level is the beer supplier or brewer, which in this case would be Molson.  The middle position is occupied by distributors or wholesalers, such as Ryan.  The bottom tier belongs to the local retailers.  The beer industry is, without question, highly regulated by the State.  See Garal Wholesalers, Ltd. v. Miller Brewing Co., 751 N.Y.S.2d 679, 686 (N.Y. Sup. Ct. 2002) ("As a matter of public policy, alcohol, manufacture, sale, and distribution, *including the termination of a beer distributorship*, is an area that is comprehensively and pervasively regulated.  The declared policy of New York is that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages.") (emphasis added).

Brewers engaged in the sale of beer in New York do so by granting distributors the right to distribute exclusively in a given territory.  As a result, distributors in a given territory tend to

become associated with the brands they distribute, for example, Ryan is in effect a Molson distributor. In 1996, New York enacted Section 55-c to regulate the contracts entered into between brewers and distributors. Although there is little legislative history concerning the passage of Section 55-c, the statute was meant to serve as a remedial measure to level the playing field between brewers and distributors/wholesalers by providing procedural and substantive protections to distributors. A New York state court recently described the intent of the legislature in passing Section 55-c:

> In signing section 55-c into law the Governor in his memorandum noted: "In approving this bill New York joins more than thirty other states which have in place similar laws governing the relationship between brewers and franchised beer wholesalers... the bill protects and provides to beer wholesalers ... written agreements and a concomitant recognition of both the value-added function performed by beer wholesalers and of the legitimate and significant interest that beer wholesalers acquire in the brands of brewers. While the bill is imperfect and has several technical flaws, it is necessary to level the playing field between brewers and beer wholesalers." [Governor's Mem. approving L.1996, ch. 679, 1996 McKinney's Session Laws of N.Y., at 1927.]

South End Distrib. Corp. v. Hornell Brewing Co., Inc., 685 N.Y.S.2d 594, 598 (N.Y. Sup. Ct. 1999); see also, Garal, 751 N.Y.S.2d at 683 n.2 ("In the legislative memorandum of the Senate sponsor of the original legislation [of Section 55-c], as enacted in 1996, State Senator Ronald B. Stafford wrote: '[Beer] wholesalers expend considerable time, money and effort in building equity in the brands they sell. This legislation recognizes the value of that equity and protects them from arbitrary termination and denial of the appointment of their successors' (see 1996 NY Legis Ann, at 504).").

The two primary remedial measures implemented under Section 55-c do the following:

(1) require all distribution agreements to be in writing, and (2) prohibit the termination and/or material modification of the terms of the agreement without good cause.  N.Y. ABC Law § 55-c(3).  Termination for "good cause" is limited to two specific scenarios:  (i) the implementation by a brewer of a national or regional policy of consolidation that is reasonable, nondiscriminatory, and essential, and (ii) the failure to comply with a material term of the distribution agreement after notice and an opportunity to cure.  Id. § 55-c(2)(e).

Pertinent to this case, subsection (7)(c) of Section 55-c states: "No brewer or beer wholesaler may impose binding arbitration of any issue as a term or condition of an agreement." Id. § 55-c(7)(c).  The statute explicitly grants an aggrieved wholesaler/distributor the right to file a civil action to challenge a termination alleged to violate Section 55-c.  Id. § 55-c(6). Additionally, to protect wholesalers, the statute directs that its requirements "may not be altered, waived or modified by written or oral agreement *in advance* of a bona fide case and controversy arising under a written agreement complying with this section."  Id. § 55-c(11) (emphasis added).  Therefore, Section 55-c does not prohibit entirely agreements to arbitrate between beer brewers and wholesalers, but it does explicitly ban pre-dispute arbitration clauses such as the one at issue in this case.

### C.      The Federal Arbitration Act

The parties do not dispute that to the extent Section 55-c prohibits pre-dispute arbitration agreements in distribution contracts between beer wholesalers and brewers, the New York statute is in direct conflict with the Federal Arbitration Act.  See 9 U.S.C. § 1 et. seq.

Section 2 of the FAA provides the following:

> A written provision in any maritime transaction or a contract
> evidencing a transaction involving commerce to settle by

> arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA defines commerce as interstate or foreign commerce. See id. § 1 ("commerce among the several States or with foreign nations"). The Molson Amendment, containing the arbitration agreement, unquestionably is a contract evidencing a transaction involving international and interstate commerce as defined by the FAA. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-4 (1995). Molson beer is brewed in Canada, shipped to Molson USA in Colorado, and then shipped for distribution to Ryan in New York.

There can be no dispute that the FAA, by its terms, applies to this contract. There also can be  no dispute that the FAA is clear evidence of Congress's intent to implement a national policy in favor of arbitration notwithstanding state laws that may conflict. As the Supreme Court has put it:

> In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.
> 
> *       *       *       *
> 
> Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements.

Southland Corp. v. Keating, 465 U.S. 1, 10, 16 (1984) (holding a state law anti-arbitration provision preempted by the FAA and in violation of the Supremacy Clause); Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) ("Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state

substantive or procedural policies to the contrary. . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

The Second Circuit has repeatedly recognized the national preference for arbitration. <u>See</u> <u>Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.</u>, 189 F.3d 289, 294 (2d Cir. 1999) ("Through the FAA, Congress has declared a 'strong federal policy favoring arbitration as an alternative means of dispute resolution.'") (quoting <u>Oldroyd v. Elmira Sav. Bank, FSB</u>, 134 F.3d 72, 76 (2d Cir.1998)). The Second Circuit has instructed that "[a]ny analysis of a party's challenge to the enforcement of an arbitration agreement must begin by recognizing the FAA's strong policy in favor of rigorously enforcing arbitration agreements." <u>Doctor's Assocs., Inc. v.</u> <u>Hamilton,</u> 150 F.3d 157, 162 (2d Cir. 1998).

New York's interests underlying Section 55-c and the national policy underlying the FAA are clearly in conflict. Ryan concedes that "if this case involved the distribution of any commodity other than alcoholic beverages, the parties' pre-dispute arbitration clause would likely be enforceable because of the FAA and principles of federal preemption." (Petitioner's Memorandum of Law in Opposition to Respondent's Motion ("Pl.'s Opp.") at 9). Whether the Twenty-first Amendment changes the equation is the present issue.

### D. The Twenty-first Amendment

Ryan urges that the anti-arbitration provision of Section 55-c is "saved" from federal preemption by section 2 of the Twenty-first Amendment, which provides:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

U.S. Const. Amend. XXI, § 2.  Following passage of the Twenty-first Amendment, which repealed the Eighteenth, the Supreme Court made clear that "by virtue of [the Amendment's] provisions a State is totally unconfined by traditional commerce clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 330 (1964).  The Supreme Court, time and again, has affirmed the States' "'virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system.'" North Dakota v. United States, 495 U.S. 423, 431 (1990) (citing California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U.S. 97, 110 (1980) (hereinafter "Midcal")); see also, 324 Liquor Corp. v. Duffy, 479 U.S. 335, 346 (1987) (hereinafter "324 Liquor");  Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 712 (1984) (hereinafter "Crisp").

Supreme Court precedent clearly establishes that New York has great authority over matters concerning the importation, sale and distribution of alcohol within its borders.  This court is mindful of New York's power in this arena, and in no way sets out to usurp or undermine that authority.  However, the court is equally mindful of the Supreme Court's admonition that New York's power to regulate alcohol is not absolute.  "The States' Twenty-first Amendment powers, though broad, are circumscribed by other provisions of the Constitution." 324 Liquor, 479 U.S. at 346 (citing a fistful of cases where state statutes enacted pursuant to the Twenty-first Amendment were overcome by other provisions of the Constitution, namely the Establishment Clause, the Equal Protection Clause, procedural due process, and the Export-Import Clause).  On many occasions, the Supreme Court has addressed the interplay between the  Commerce Clause and the

Twenty-first Amendment, and the Court has cautioned that "to draw a conclusion ... that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would ... be an absurd oversimplification." Crisp, 467 U.S. at 712-3 (quoting Hostetter, 377 U.S. at 331-2). Thus, as will be discussed at length below, Section 55-c is not automatically saved by virtue of the fact that its passage was an exercise of New York's power under the Twenty-first Amendment.

II.    Discussion

    A.    Section 55-c Does Not Implicate the Core of the Twenty-first Amendment

        In determining whether Section 55-c's prohibition of pre-dispute arbitration trumps the Federal Arbitration Act, I must first determine whether the state law implicates a "core" concern of the Twenty-first Amendment. Ryan argues that – notwithstanding a finding that Congress intended the FAA to preempt state laws – Section 55-c is saved by the Twenty-first Amendment because the state law falls within the "core" of the power reserved to the States by the Twenty-first Amendment, and New York's interest thus outweighs any federal interest underlying the FAA. (See Pl.'s Opp. at 14-20). Molson responds that Section 55-c(7)(c) is not a law that directly implicates New York State's regulation of liquor importation or sale, but rather concerns only the procedural issue of the forum in which a dispute arising out of an alcohol distribution contract will be heard. (See Defendant Molson USA's Reply Memorandum of Law in Support ("Def.'s Reply") at 4).

        Whether a "core" power of the Twenty-first Amendment is at stake must be analyzed using the framework that has been articulated by the Supreme Court for cases where the validity

of state statutes concerning liquor, enacted pursuant to the Twenty-first Amendment, are

challenged. This framework is often referred to as "the modern accommodation standard rule."

See 116 A.L.R. 5th 149 ("Interplay Between Twenty-first Amendment and Commerce Clause

Concerning State Regulation of Intoxicating Liquors"). Under the modern accommodation

standard rule, the threshold question is whether the statute at issue violates the Commerce Clause.

If there is a Commerce Clause violation, the court must then question whether the statute can be

saved by the Twenty-first Amendment "by determining if the core concerns of the Twenty-first

Amendment are sufficiently implicated by the statute's core concerns." Id.

In the present case, Subsection (7)(c) of Section 55-c is challenged not expressly as a

violation of the Commerce Clause, but as invalid under the Federal Arbitration Act, a

Congressional statute with which it is clearly in conflict. The modern accommodation standard

rule, nonetheless, is still the appropriate test to utilize because the FAA was enacted pursuant to

Congress's Commerce Clause power, see Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S.

265, 271 (1995), and because an Act of Congress should be treated as the equivalent of a

constitutional provision. See Midcal, 445 U.S. at 111 ("Although this federal interest is

expressed through a statute rather than a constitutional provision, Congress exercised all the

power it possessed under the Commerce Clause when it approved [the statute].") (internal

quotation and citation omitted); see also Stawski Distrib. Co. v. Browary Zywiec S.A., 349 F.3d

1023, 1026 (7th Cir. 2003) (holding Illinois state law anti-arbitration provision analogous to

Section 55-c preempted by FAA because the state interest is "some distance from the language of

§ 2 [of the FAA]); In re G. Heilman Brewing Co., 128 B.R. 876, 882-3 (Bankr. S.D.N.Y. 1991)

(applying modern accommodation standard rule and finding that an Oregon statute concerning

terminations of alcohol distribution agreements "serves a direct Twenty-First Amendment interest").

Thus, my threshold determination must be whether or not the pre-dispute arbitration prohibition of Section 55-c implicates the core of the Twenty-first Amendment. Although the "core concerns" of the Twenty-first Amendment have never been clearly defined, the Supreme Court has provided insight into the contours of the concept. In North Dakota v. United States, the Court found that state liquor labeling and reporting regulations "[fell] within the core of the State's power under the Twenty-first Amendment," and therefore were not preempted by a federal statute governing the procurement of alcoholic beverages on military bases. North Dakota, 495 U.S. at 432. There, the Court offered the following as falling within the "core" interests served by the Twenty-first Amendment: (1) promoting temperance; (2) ensuring orderly market conditions; and (3) raising revenue. Id.

In other major Supreme Court decisions concerning the interplay between the Twenty-first Amendment and state liquor laws, the Court has offered some guidance as to what *may not* constitute a core concern. In Midcal, the Court considered the state statutory scheme governing California's wine pricing system and whether that system constituted retail price maintenance in violation of the Sherman Act. Without explicitly mentioning the "core" of the Amendment, the Court analyzed the interest served by the state's wine pricing system. The Court explained: "In terms, the [Twenty-first] Amendment gives the States control over the 'transportation or importation' of liquor into their territories. Of course, such control logically entails considerable regulatory power not strictly limited to importing or transporting alcohol. We should not, however, lose sight of the explicit grant of authority." Midcal, 445 U.S. at 107 (internal citation

omitted).  The Court accepted the state's identification of the two state interests served by the wine pricing system: (1) maintaining orderly market conditions to protect small wine retailers; and (2) promoting temperance.  The Court nonetheless found that the state interests were "unsubstantiated" and thus "not of the same stature as the goals of the Sherman Act."  Id. at 113-4.

The Midcal court did not clearly state whether or not it found California's wine pricing system to implicate the core of the Twenty-first Amendment.  To the extent that it did not make such a determination, the Court suggests that a pricing system is not within the core powers reserved to the States under the Amendment.  However, to the extent that it found that the statutory pricing system does implicate the central powers of the Amendment (which can be implied from the proffered state interest in maintaining orderly market conditions and promoting temperance), the Court suggests that the proffered state interests protected by the Twenty-first Amendment must be supported by a finding based on evidence in the record that the interests are in fact served by the state statute.  In Midcal, the Court determined that the state interest was "unsubstantiated" based on state and congressional studies in the record that demonstrated that the pricing system did not substantially promote those interests.  See id. at 112-3.

In 324 Liquor, the Supreme Court engaged in an analysis analogous to the one employed in Midcal to determine that New York's statutory scheme governing liquor pricing could not prevail over the Sherman Act, notwithstanding the Twenty-first Amendment.  The State put forth its interest in protecting the economic position of small retailers.  324 Liquor, 479 U.S. at 348. Relying again on state sponsored studies in the record and the absence of "legislative or other findings" or determinations by the New York Court of Appeals to support the state's position, the

Court concluded, "[w]e are unwilling to assume on the basis of this record that [the state statute] has the effect of protecting small retailers." 324 Liquor, 479 U.S. at 350. Like in Midcal, the Court held that the state interest was "unsubstantiated" and thus could not trump the federal interests underlying the Sherman Act.[2] Id. From the Supreme Court's opinion in 324 Liquor, we can draw no more specific conclusions than those drawn from Midcal concerning the precise contours of the core of the Twenty-first Amendment.

The Crisp case provides additional insight into the Supreme Court's notion of what constitutes the core concerns of the Twenty-first Amendment. Crisp dealt with a challenge to an Oklahoma state law that banned the broadcasting of advertisements for alcoholic beverages on cable TV. The challengers argued that the state law was preempted by federal regulations enacted by the Federal Communications Commission ("FCC") pursuant to the Federal Communications Act. Crisp, 467 U.S. at 698. The Crisp court all but directly stated that the State's advertising ban did not implicate the "core" of the Twenty-first Amendment:

> In contrast to state regulations governing the conditions under which liquor may be imported or sold within the State . . . the application of Oklahoma's advertising ban to the importation of distant signals by cable television operators engages only indirectly the central power reserved by § 2 of the Twenty-first Amendment – that of exercising "control over whether to permit importation or sale of liquor and how to structure the liquor distribution system."

Crisp, 467 U.S. at 715 (quoting Midcal, 445 U.S. at 110). Although the "core" language was not expressly employed, the Court strongly implied that the advertising statute did not serve a core interest, and thus the federal law prevailed. Crisp, 467 U.S. at 716.

---

[2] The Court did not reach the question of whether the state statutory scheme could be upheld as an exercise of the State's power to promote temperance. 324 Liquor Corp., 479 U.S. at 351-2.

From North Dakota, Midcal, 324 Liquor, and Crisp emerges an ill-defined sense of what does and what does not fall within the core of the Twenty-first Amendment. The precedent, at best, offers a statutory spectrum that can guide my analysis in this case. The spectrum represents state laws and regulations touching alcohol and the degree to which they implicate the core concerns of the Twenty-first Amendment. One end of the spectrum can be deemed the 'direct implication' end, and this end represents state laws that directly regulate the state alcohol sale, importation and distribution system. As North Dakota makes clear, a state law requiring labeling and reporting of alcohol sold in that state would lie toward this end of the spectrum. The opposite end of the spectrum can be deemed the 'indirect implication' end, comprised of laws that have little, if any, effect on a state's system of alcohol sale, importation and distribution. As Crisp holds, a state law prohibiting alcohol advertisements on cable television would lie closer to this end. Under Midcal and 324 Liquor, state laws governing alcohol retail pricing systems rest somewhere between the two state laws just identified, though decidedly toward the indirect implication end of the spectrum.

The question now before me is where on this "core concern" spectrum the anti-arbitration clause of Section 55-c falls. Because I find that this provision falls substantially closer to the 'indirect implication' end of the spectrum than even the cable TV advertising law at issue in Crisp, I conclude that Section 55-c(7)(c) does not fall within the core of the Twenty-first Amendment.

The provision prohibiting pre-dispute arbitration found in Section 55-c concerns a purely procedural matter. See Stawski, 349 F.3d at 1026 (concerning Illinois's counterpart to Section 55-c(7)(c)). In Stawski, Judge Easterbrook explained by example:

> Suppose that Illinois had attempted to require all disputes arising
> out of the Beer Industry Fair Dealing Act to be litigated in state
> court.  Could such a statute block [the brewer] from removing to
> federal court under 28 U.S.C. § 1441(a), given the complete
> diversity of citizenship?  Surely not.  Yet a federal court would be a
> forum different from the one specified by Illinois law, just as
> arbitration occurs in a different forum.  If removal under federal law
> is proper, then arbitration under federal law must be proper – in
> either event, it is the Supremacy Clause that subordinates the state's
> preference to the federal rule.

Id. (internal citation omitted).  Judge Easterbrook's hypothetical demonstrates the procedural nature of this provision.  Subsection (7)(c) of Section 55-c is a procedural provision, and as such it does not directly implicate the Twenty-first Amendment.

Of course, certain provisions of Section 55-c may implicate the core of the Amendment.  Indeed, counsel for Molson USA admitted as much during oral argument: "[W]e would suggest that if one were to [ask what] is the good cause requirement for termination a part of the core powers, it is [a] closer [question] . . . but who decides the issue is substantially farther over towards non-core."  (October 19, 2005 Hearing Transcript ("Tr.") at 39).  This court recognizes that Section 55-c is meant to regulate the relationship between beer brewers and wholesalers, and to provide protection to wholesalers who have entered into a distribution relationship with brewers.  The statute mandates, among other things, that agreements be in writing, that wholesalers only be terminated upon a showing of good cause, and that wholesalers terminated based on a brewer's proper national policy of consolidation be reasonably compensated.

Admittedly, certain provisions of this statutory scheme *might* implicate the State's reserved power under the Twenty-first Amendment to maintain orderly market conditions or to structure the state liquor distribution system.  However, I need not reach that conclusion in the present case because it is only the pre-dispute anti-arbitration provision of the statute that is

challenged.  I am not persuaded by Ryan's argument that this particular provision is central to "the creation and the preservation of the three-tier system of distribution."  (Tr. at 28).  Ryan argues that the provision is critical to the State's maintenance of the three-tier system because it ensures that "the middle tier, the wholesalers, remain strong, viable and independent of the first tier [i.e. the brewers]."  (Id. at 30).  Certainly that is the apparent goal of Section 55-c.  However, even looking at the statutory scheme as a whole, as Ryan urges us to do (see Tr. at 28),  and as the Supreme Court arguably did in North Dakota v. United States, I cannot find that the anti-arbitration provision at issue here is a "necessary component[] of the regulatory regime" akin to the labeling and reporting regulations challenged in the North Dakota case.[3]  North Dakota, 495 U.S. at 432.  If the statutory scheme governing pricing of alcohol, which unquestionably is a *component* of the state's scheme to regulate and control the sale and importation of liquor, has been found by the Supreme Court not to concern a core power of the Twenty-First Amendment,[4] I can find no reason to conclude that a provision prohibiting arbitration of brewer-distributor contract disputes does so.  See generally, Midcal, 445 U.S. 97; 324 Liquor, 479 U.S. 335.

Section 55-c(7)(c) governs a procedural matter affecting only the forum in which a dispute will be considered.  Moreover, *and importantly*, it is not disputed that the substantive provisions of Section 55-c will apply in any arbitration that is to occur, in accordance with the choice of law

---

[3] In North Dakota, the Court explained: "It is necessary for the State to record the volume of liquor shipped into the State and to identify those products which have not been distributed through the State's liquor distribution system."  North Dakota, 495 U.S. at 433.  The reporting and labeling requirements are without question more directly connected to the State's control over the alcohol distribution system than the anti-arbitration provision at issue in the instant case.

[4] To the extent that the Supreme Court may have determined that the pricing schemes at issue in Midcal and 324 Liquor did implicate core concerns of the Twenty-first Amendment, the balancing test will nonetheless fall in favor of the federal interest.  See infra Part III. B.

provision in the parties' contract.  (See Tr. at 30).  Thus the substantive protections put in place by the New York legislature through the enactment of Section 55-c will serve to protect Ryan in the resolution of his termination dispute.

Accordingly, for the reasons discussed above, I find that the anti-arbitration provision found in subsection (7)(c) of Section 55-c does not implicate a "core" power reserved to the States under the Twenty-first Amendment.  This determination, however, does not end the Court's inquiry.

### B.       Balancing the State vs. the National Interest

Having determined that the core of the Twenty-first Amendment is not implicated here, I now turn to whether a balancing of the federal versus state interest is required.  On this question, the Supreme Court has not spoken definitively.  Molson USA asserts that the Court has held balancing  not to be required once there has been a determination that the state law does not concern the central powers of the Twenty-first Amendment.  Molson urges this court to find as Judge Easterbrook did in Stawski that the federal interest prevails without conducting any balancing of the state and federal interests.  See Satwski, 349 F.3d at 1026.

Although Judge Easterbrook ostensibly relied on Midcal, 324 Liquor, and Crisp in his opinion, and chose not to balance the competing interests, I find that a fair reading of those cases does not direct that outcome.  As previously discussed, in those cases the Court did not explicitly express (a) whether it found a core or non-core interest to be at stake, (b) whether it conducted a balancing of the interests dependent on that finding, or (c) whether it analyzed the state and federal interests involved simply to establish the validity or strength of the competing interests. See generally 324 Liquor, 479 U.S. at 346-52; Crisp, 467 U.S. at 711-6; Midcal, 445 U.S. at 106-

20

14. <u>Crisp</u> provides perhaps the strongest support for the position advanced by Molson USA.

There, Justice Brennan, speaking for a unanimous court, stated:

> [W]e hold that when, as here, a state regulation squarely conflicts with the accomplishment and execution of the full purposes of federal law, and the State's central power under the Twenty-first Amendment of regulating the time, places, and manner under which liquor may be imported and sold is not directly implicated, the balance between state and federal power tips decisively in favor of the federal law, and enforcement of the state statute is barred by the Supremacy Clause.

<u>Crisp</u>, 467 U.S. at 716. While the Court may *imply* in the above passage that, because the balance will inevitably fall in favor of the federal statute, balancing is not necessary when a core power of the Twenty-first Amendment is not implicated, it does not do so categorically. Indeed, in <u>Crisp</u>, <u>Midcal</u>, and <u>324 Liquor</u>, the Court appears to balance state and federal interests against one another. Thus, I am obliged to assign weight to these competing interests, albeit with an understanding that because the core powers of Twenty-first Amendment are not directly in issue, the balance is likely to tip in favor of the federal interest – here, the national policy in favor of arbitration.

I reach this conclusion for a number of reasons. First, the Court on several occasions has stated that resolution of this issue requires a "pragmatic effort to harmonize state and federal powers." <u>Midcal</u>, 445 U.S. at 109; <u>see also</u>, <u>324 Liquor</u>, 479 U.S. at 347 (quoting the same); <u>Crisp</u>, 467 U.S. at 714 (same). This implies that a balancing analysis is necessary. Second, although Section 55-c(7)(c) may not directly implicate a core or central power reserved to the States under the Twenty-first Amendment, this case certainly, at the least, implicates a constitutional principle. Thus it is essential for this court to provide a thoughtful explanation as to why a state statute that has been enacted pursuant to a Constitutional Amendment will not

prevail.  By conducting a balancing test, I am able to provide that explanation.

And, finally, in this case the balance does tip decisively in favor of the Federal Arbitration Act.  Ryan has argued that Section 55-c serves the state interest in maintaining the viability of its three-tier alcohol distribution system.  There is, however, no evidence in the record that adequately supports this assertion.  There is scant legislative history, consisting only of legislative memoranda of the Governor and a State Senator, which suggest that the state interest was to protect distributors.  See South End Distrib. Corp., 685 N.Y.S.2d at 598 (quoting Governor's signing memorandum); Garal, 751 N.Y.S.2d at 683 n.2 (quoting legislative memorandum of state senator).  Furthermore, notwithstanding that there is little, if any, evidence that would establish the state interest at stake, there is no evidence in the record to support a finding that the statute actually serves the proffered interests.  See Midcal, 445 U.S. at 112-13 (discussing evidence in the record of studies, legislative findings and state court findings that nonetheless failed to substantiate that the state interest outweighed the federal interest); 324 Liquor, 479 U.S. at 348 (same).

In contrast, the federal government has clearly articulated its interest in promoting a national policy in favor of arbitration.  See e.g., Southland Corp., 465 U.S. at 10-16 (1984).  Even with evidence that would support a finding that the state's proffered interests are served by Section 55-c, overcoming Congress's unequivocal intent "to foreclose state legislative attempts to undercut the enforceability of arbitration agreements" would present a formidable challenge to Ryan.  Id.[5]  Based on the record before me, I find that the "the State's unsubstantiated interest . . .

---

[5] The North Dakota case also supports this holding in that, there, the Supreme Court considered the fact that "the text of the [federal] regulation itself [does not] purport to pre-empt any state laws."  North Dakota, 495 U.S. at 442.  The Federal Arbitration Act, to the contrary,

'simply is not of the same stature as the goals of [the Federal Arbitration Act].'" 324 Liquor, 479

U.S. at 350 (quoting Midcal, 445 U.S. at 114). Accordingly, and because a "core" power of the

Twenty-first Amendment is not implicated in this case, the balance tips decisively in favor of the

federal statute. Notwithstanding Section 2 of the Twenty-first Amendment, I hold that Section

55-c(7)(c) is preempted by the Federal Arbitration Act.

## C. Congress Has Not "Federalized" State Liquor Laws

Ryan puts forth an alternative argument to advance its position that the Twenty-first

Amendment should save Section 55-c from federal preemption. Ryan asserts that "Congress may

override the presumption favoring arbitration agreements by a contrary provision in another

statute." (Pl.'s Opp. at 10). Indeed, the Supreme Court has stated:

> The Arbitration Act, standing alone, therefore mandates
> enforcement of agreements to arbitrate statutory claims. Like any
> statutory directive, the Arbitration Act's mandate may be overridden
> by a contrary congressional command. The burden is on the party
> opposing arbitration, however, to show that Congress intended to
> preclude a waiver of judicial remedies for the statutory rights at
> issue.

Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 226-7 (1987) (internal citations

omitted). Ryan argues that the Webb-Kenyon Act, a precursor to the Twenty-first Amendment,

and the Twenty-first Amendment Enforcement Act, which was passed in 2000 and amended the

Webb-Kenyon Act, evidence Congress's intent to preclude state laws concerning arbitration

agreements in contracts for the distribution of alcohol – such as Section 55-c – from the purview

of the FAA. (See generally Pl.'s Opp. at 10-13). The Twenty-first Amendment Enforcement Act

---

has been interpreted as a clear expression of Congress's intent to pre-empt state laws in conflict
with it. See Southland, 465 U.S. at 16.

granted state Attorney Generals the right to enforce their State laws regulating the importation or transportation of liquor in federal court by way of an injunction.  See 27 U.S.C. § 122a.

Specifically, Ryan contends that through these federal statutes and passage of the Twenty-first Amendment, Congress has "subsumed" or "assimilated" state liquor laws to the effect that "state liquor laws are the equivalent of federal laws" and therefore exempt from the FAA.  (See Pl.'s Opp. at 10).  Again, this presents an issue of first impression in this circuit.[6]  At oral argument, Ryan's counsel offered the following hypothetical to illustrate his argument:

> The New York State Attorney General could be downstairs in the
> lobby as we speak filing an action against Molson to enjoin them
> from compelling [enforcement of] pre-dispute arbitration clauses . . .
> and Molson would be precluded from arguing against that lawsuit
> that the FAA trumps the Twenty-first Amendment Enforcement Act
> because they are both federal statutes."

(Tr. at 24-5).  Ryan asserts that because the State Attorney General cannot be subjected to a Supremacy Clause defense, Ryan should not be either.  This argument, however, fails for two reasons.

First, I find no reason to believe that Congress intended to subsume or "federalize" state liquor laws when it passed Webb-Kenyon, the Twenty-first Amendment, or the Twenty-first

---

[6] The Eleventh Circuit is the only circuit that has ruled, albeit indirectly, on this issue.  In Florida Dep't of Bus. Regulation v. Zachy's Wine & Liquor, Inc., 125 F.3d 1399 (11th Cir. 1997), a decision rendered *before* passage of the Twenty-first Amendment Enforcement Act, the Eleventh Circuit held that the Webb-Kenyon Act did not create an implied federal cause of action.  The court also briefly addressed the State's argument that "Webb-Kenyon is an assimilated act because it subsumes state liquor laws and thereby renders the violation of those laws a breach of federal law."  Zachy's, 125 F.3d at 1405.  The Circuit Court rejected this argument, primarily because to affirm it would not have affected the court's conclusion as to whether Webb-Kenyon created an implied right of action.  See id.  To the extent that the Eleventh Circuit dismissed this argument on its merits, it provides little guidance in the present case because the Twenty-first Amendment Enforcement Act has since been enacted.

Amendment Enforcement Act ("Enforcement Act").  Indeed, the text of the Enforcement Act itself suggests a finding to the contrary, as it provides the following rule of construction:

> This section shall be construed only to extend the jurisdiction of Federal courts in connection with State law that is a valid exercise of power vested in the States--
>> (1) under the twenty-first article of amendment to the Constitution of the United States as such article of amendment is interpreted by the Supreme Court of the United States including interpretations in conjunction with other provisions of the Constitution of the United States; and
>> (2) under section 122 of this title as such section is interpreted by the Supreme Court of the United States; *but shall not be construed to grant to States any additional power*.

27 U.S.C. § 122a(e) (emphasis added).  Moreover, in the Congressional Report accompanying H.R. 2031, the Twenty-first Amendment Enforcement Act, it was expressed that "H.R. 2031 was introduced in order to specifically provide states with access to federal court to enforce their laws regulating interstate shipments of alcoholic beverages.  *H.R. 2031 does not change any existing state law nor does it change existing case law interpreting the Commerce clause.*"  H.R. REP. 106-265, at 5-6 (emphasis added).

The legislature did not intend to subsume state laws because passage of the Enforcement Act was expressly not meant to change any existing law or the interpretation of any precedent. Rather, it was meant only to provide the States with a forum for challenging violations of their state liquor laws, and does not, therefore, "save" Section 55-c from federal preemption by the Federal Arbitration Act.

Secondly, although the Twenty-first Amendment grants  a federal cause of action to States' Attorney Generals and precludes a supremacy clause defense in such a federal case, this right has little impact in the present case, which is distinguished on the grounds that Molson USA

and Ryan have entered into a written agreement to arbitrate.   In the absence of a contract

containing an arbitration clause entered into by the State of New York and a beer brewer, it may

be true that the state liquor law would prevail in a federal action brought by the Attorney General

under the Enforcement Act.   However, here there is a written agreement entered into by Ryan and

Molson.   The Twenty-first Amendment Enforcement Act's creation of  a federal cause of action

does not affect the applicability of the FAA to this private agreement to arbitrate.

Ryan also argues that Congress, in passing the Webb-Kenyon Act and the Twenty-first

Amendment, has limited the preemptive effect of the FAA on state liquor laws.  Ryan relies on

the Second Circuit case of Stephens v. American Intl. Ins. Co., 66 F.3d 41 (2d Cir. 1995), to

advance its position.  In Stephens, the issue was whether a state law anti-arbitration provision

contained in the Kentucky Insurers Rehabilitation and Liquidation Law was preempted by the

FAA.  There, the court found in favor of the state anti-arbitration law by virtue of Congress's

passage of the McCarran-Ferguson Act.  The McCarran-Ferguson Act was found to preserve the

state statute from preemption because Congress, through the Act's terms, had explicitly made

federal statutes inapplicable to state laws regulating the business of insurance.  The Kentucky

law's anti-arbitration provision was held to be such a state law.  See generally Stephens, 66 F.3d

at 44-45.

Ryan's reliance on Stephens is unpersuasive.  The McCarran-Ferguson Act contained the

following language: "No Act of Congress shall be construed to invalidate, impair or supersede

any law enacted by any State for the purpose of regulating the business of insurance . . . unless

such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  This language

evinces Congress's intent that the FAA should not interfere with any state enactment related to

the business of insurance.  In the present case, however, the Webb-Kenyon Act cannot convincingly be likened to the McCarran Act.  The Webb-Kenyon Act expresses no intent to render federal laws inapplicable to state liquor laws.  The Plaintiff concedes as much, but further argues that "because the Webb-Kenyon Act, followed by the 21st Amendment, granted the States the *exclusive right* to regulate the distribution of alcohol within their own borders, Congress did not need to expressly address the issue of the potential invalidation of a State liquor law by a federal statute directly related to the distribution of alcohol."  (Pl.'s Opp. at 13).  This argument cannot stand, however, as the Supreme Court has held to the contrary.  See Midcal, 445 U.S. 97 (1980) (holding that Twenty-first Amendment did not bar application of the Sherman Act); Granholm v. Heald, 125 S.Ct. 1885, 1903 (2005) ("[T]he Court has held that § 2 [of the Twenty-first Amendment] does not abrogate Congress' Commerce Clause powers with regard to liquor . . .") (citations omitted).

Therefore, I find that Congress's enactment of the Webb-Kenyon Act and of the Twenty-first Amendment Enforcement Act has neither exempted Section 55-c of the New York ABC Law from application of the FAA, nor limited application of the federal law to the New York statute.

### D.    Statute of Limitations

Having decided that the FAA preempts the state law predispute anti-arbitration provision of Section 55-c, there is a final issue to be addressed: whether this court or the arbitrator should properly decide a statute of limitations dispute that has arisen.

Ryan argues that Molson USA has failed to comply with an express term of their contract that requires that arbitration be commenced within one year from "the date the dispute first arose."  (See Ryan Aff. Ex. B) (Molson Amendment Section 6.2).  Ryan maintains that the

"dispute" at issue is whether Molson USA has implemented a nationwide policy of consolidation that is reasonable, non-discriminatory and essential such that Molson would have good cause under Section 55-c to terminate its relationship with Ryan. (See Pl.'s Opp. at 23). This dispute, Ryan argues, arose, *at the latest*, in 2002 when Molson first announced its consolidation policy for the New York market, and at which time Ryan's counsel began correspondence with Molson's counsel regarding the policy. (See id.). Accordingly, Ryan contends that this dispute arose three years ago and can no longer be arbitrated under the express contract terms.

Molson USA counters that the dispute did not arise until July 2005, when Molson commenced its arbitration demand, because it was not until that time that operation of Section 55-c was triggered by Molson's attempt to terminate Ryan. (See Def.'s Mot. at 21). Thus, Molson argues that the arbitration is indeed timely.

The question of when the one-year limitations period was triggered need not be decided by this court, and thus I will express no opinion on that issue. It is well established in this Circuit, and indeed by the Supreme Court, that procedural matters are left to the decision of the arbitrator once the district court determines that the arbitration agreement is enforceable. As recently as 2002, the Supreme Court addressed whether a court or arbitrator should decide whether a time limitation contained in an NASD arbitration regulation had been fulfilled. The Court explained:

> '[P]rocedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide. So, too, the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U.L.A. 12-13 (Supp. 2002). And the

> comments add that "in the absence of an agreement to the contrary,
> issues of substantive arbitrability . . . are for a court to decide and
> issues of procedural arbitrability, i.e., whether prerequisites such as
> *time limits,* notice, laches, estoppel, and other conditions precedent
> to an obligation to arbitrate have been met, are for the arbitrators to
> decide." Id., § 6, comment 2, 7 U.L.A., at 13.

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85 (2002) (emphasis in original)

(internal quotations and citations omitted).  This passage clearly directs the proper outcome.

Ryan, nonetheless, has brought to the court's attention the case of Marcus v. Frome, 275

F. Supp. 2d 496 (S.D.N.Y. 2003) (Koeltl, J.), to support the argument that the limitation

requirement is properly decided by the court and not the arbitrator.  In Frome, Judge Koeltl

determined not to compel arbitration despite the existence of an enforceable arbitration agreement

because neither party had made an arbitration demand as required by the terms of their contract.

Frome, 275 F.Supp.2d at 505-6.  The court found that the plaintiff's argument that Frome had

failed to make an arbitration demand "is analogous to an argument of waiver to the extent that it

suggests that Frome may not be entitled to a stay of the claims against him where the right to

arbitration is not appropriately invoked."  Id. at 506.  Although Frome does provide support for

Ryan's argument, given the Supreme Court precedent in Howsam, I am unpersuaded to follow the

approach suggested by Frome.

In addition, there is established precedent in the Second Circuit which informs my

decision.  In holding that the arbitrator – and not a judge – should decide the question of whether

a limitations period in an arbitration clause had run, the Circuit Court has explained:

> When one party to a dispute seeks to stay the other party's demand
> for arbitration by raising various defenses to arbitration before a
> district court, there is a considerable temptation for the court to pass
> on the validity of such defenses rather than to refer their resolution
> to an arbitrator. . . . These reactions, while understandable, are at

odds with the policy considerations embodied in the Federal
Arbitration Act, which favor the enforcement of arbitration
agreements..

Conticommodity Servs. Inc. v. Philipp & Lion,  613 F.2d 1222, 1224 (2d Cir. 1980); see also

Martens v. Thomann, 273 F.3d 159, 179 n. 14 (2d Cir. 2001) ("Generally . . . if the claims are

subject to a valid and enforceable arbitration agreement, the arbitrator, not the court, should be

deciding the statute of limitations issue.").

Thus, I hold that the issue of when the one-year limitations period was triggered and the

corresponding question of whether or not the time in which Molson could permissibly bring an

arbitration has expired are issues to be decided by the arbitrator, and not this court.


**III.     Conclusion**

In conclusion, I find that Section 55-c(7)(c) of the New York State Alcoholic Beverages

Control Law is preempted by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.  I therefore direct

the parties to proceed with arbitration in accordance with Section 4 of the FAA, which provides,

in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of
> another to arbitrate under a written agreement for arbitration may
> petition any United States district court [with proper jurisdiction] . . .
> for an order directing that such arbitration proceed in the manner
> provided for in such agreement.

9 U.S.C. § 4.

For the reasons discussed above, I also find that there are no genuine issues of material

fact in dispute and that Molson USA is entitled to judgment as a matter of law with respect to

Ryan's motion to permanently stay arbitration.  Molson USA's Motions for Summary Judgment

and to Compel Arbitration are GRANTED.  Under the authority granted to me in Section 4 of the

FAA, I order arbitration before the American Arbitration Association to proceed in accordance

with the parties' written agreement.  I hereby grant a stay of twenty days from the date hereof in

the enforcement of this Order to permit Ryan to seek a stay pending appeal from the United States

Court of Appeals for the Second Circuit.


SO ORDERED.


Dated: November 7, 2005                              _____/s/_____
       Brooklyn, NY                                 Nicholas G. Garaufis
                                                    United States District Judge